No. 22-3287

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

SMART COMMUNICATIONS HOLDING, INC., and HLFIP HOLDING, INC.
d/b/a SMART COMMUNICATIONS IP HOLDINGS,

Plaintiffs – Appellants,

v.

GLOBAL TEL-LINK CORPORATION, COUNTY OF YORK, YORK COUNTY
PRISON, and ADAM OGLE in his official capacity as York County Prison
Warden,

Defendants – Appellees.

---

Appeal from the United States District Court
for the Middle District of Pennsylvania

---

REPLY BRIEF OF APPELLANTS

---

Katrina M. Quicker
Kathryn A. Vance
QUICKER LAW, LLC
800 Battery Avenue SE, Suite 100
Atlanta, GA 30339
(678) 750-0450

Matthew M. Haar
SAUL EWING LLP
2 N. Second Street, 7th Floor
Harrisburg, PA 17101
(717) 257-7508

William N. Sinclair
Phillip J. Closius
Todd W. Hesel
SILVERMAN THOMPSON SLUTKIN &
    WHITE LLC
400 E. Pratt St., 9th Floor
Baltimore, Maryland 21202
(410) 385-2225

*Attorneys for Appellants*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................1

REPLY ARGUMENT .......................................................................2

I.      THIS COURT HAS JURISDICTION............................................ 2

II.     SMART'S COMPLAINT STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT. ................................................................. 3

     A.    The Prison is a relevant geographic market. ........................3

          i.    Defendants' proposed single national market does not conform with the facts as alleged or the purpose of antitrust law............ 4

          ii.   Recognition of a national geographic market does not require rejection of the Prison as another relevant geographic market...5

          iii.  Defendants cite no authority barring recognition of the Prison as a relevant geographic market under the unique circumstances of this case. ......................................................................7

     B.    Smart has antitrust standing. ...........................................14

          i.    Smart, unlike Host, pleaded an unreasonable restraint on trade. ......................................................................................14

          ii.   Smart, unlike Host, pleaded harm to consumers. .....................16

III.    THE COMPLAINT STATED CLAIMS FOR TORTIOUS INTERFERENCE AND UNFAIR COMPETITION....................................................18

     A.    The Complaint adequately pleads defamation even under GTL's overly strict, incorrect standard............................................19

B.   GTL's alternative grounds for affirmance fail—the false statements are actionable and are reasonably likely to have caused Smart to lose the contract. .........................................................21

    i.   The false statements are actionable statements of fact or opinion implying defamatory facts. .........................................................22

    ii.   There is a reasonable likelihood the false statements caused Smart to lose the contract. .........................................................24

C.   Pennsylvania recognizes unfair competition based on defaming a business rival. .........................................................25

CONCLUSION .........................................................27

CERTIFICATION OF BAR MEMBERSHIP .........................................................28

CERTIFICATE OF COMPLIANCE .........................................................29

CERTIFICATE OF FILING AND SERVICE .........................................................30

# <u>TABLE OF AUTHORITIES</u>

**FEDERAL CASES**

*Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019) ............................................................5

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................18

*Barron v. Washington Cnty. Child. & Youth Soc. Serv. Agency*, No. CIV.A. 05-1517, 2006 WL 931678 (W.D. Pa. Apr. 11, 2006) .....................................24, 25

*Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011)...................................9, 11

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ..................................13

*Daleure v. Commonwealth of Kentucky*, 119 F. Supp. 2d 683 (W.D. Ky. 2000) ...............................................................................................................12, 13

*Deborah Heart & Lung Center v. Virtua Health, Inc.*, 833 F.3d 399 (3d Cir. 2016) ............................................................................................7, 8, 9, 13

*Doe v. Princeton Univ.*, 30 F.4th 335 (3d Cir. 2022) .............................................14

*Electro Med. Equip. Ltd. v. Hamilton Med. AG*, No. CIV.A. 99-579, 2000 WL 675716 (E.D. Pa. May 24, 2000) ..........................................................24

*Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169 (3d Cir. 2009)...........................26

*Forrest v. Owen J. Roberts Sch. Dist.*, No. CIV.A.09-3014, 2011 WL 1549492 (E.D. Pa. Apr. 1, 2011) ...............................................................23

*GTL v. FCC*, 866 F.3d 397 (D.C. Cir. 2017) ...................................................4, 5, 8

*Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015) ...........................................................................................3, 10

*Host International, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022) .....................................................................................................passim

*Lee v. Univ. of Pa., Sch. of Dental Med.*, No. CV 19-835, 2019 WL 4060843 (E.D. Pa. Aug. 27, 2019) .........................................................20

*Monge v. Univ. of Pa.*, No. CV 22-2942, 2023 WL 2391004 (E.D. Pa. Mar. 7, 2023) ............................................................................................23

*Mzamane v. Winfrey*, 693 F. Supp. 2d 442 (E.D. Pa. 2010) ....................................22

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440 (9th Cir. 1988) ...................4, 5, 6, 7

*P&I Ins. Servs., LLC v. Risk Averse Ins.*, LLC, No. CV 20-5910, 2022 WL 103135 (E.D. Pa. Jan. 11, 2022) ................................................................20

*Pace v. Baker-White*, 432 F. Supp. 3d 495 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021)................................................................22

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018) ......................................................................11, 12

*Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. CIV.A. 99-1568, 1999 WL 1212189 (E.D. Pa. Dec. 17, 1999)......................................24

*PennPac Int'l, Inc. v. Rotonics Mfg., Inc.*, No. CIV. A. 99-CV-2890, 2001 WL 569264 (E.D. Pa. May 25, 2001) ..........................................................24

*Roskos v. Sugarloaf Twp.*, 295 F. Supp. 2d 480 (M.D. Pa. 2003) ..........................20

*Sarkisian v. Rooke*, No. 06-CV-00170, 2007 WL 9811040 (E.D. Pa. Mar. 23, 2007) ......................................................................................23

*Spireas v. Comm'r of Internal Revenue*, 886 F.3d 315 (3d Cir. 2018).....................7

*Synthes (U.S.A.) v. Globus Med., Inc.*, No. CIV.A. 04-CV-1235, 2005 WL 2233441 (E.D. Pa. Sept. 14, 2005) .........................................24, 25, 26

*Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961).......................9, 10

*Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991).............3, 6, 10, 13

*United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963) ............................9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ..........14

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ..............................16

STATE CASES

*Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469 (Pa. 1964) ................................................................................25, 26

iv

*Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Servs., Inc.*, No. 1994-2166, 1995 WL 842000 (Pa. Com. Pl. Oct. 18, 1995)..............26

*Meyers v. Certified Guar. Co., LLC*, 221 A.3d 662 (Pa. Super. Ct. 2019)..............23

**FEDERAL STATUTES**

Clayton Act § 3 ....................................................................................................9

Clayton Act § 4 ..................................................................................................13

Sherman Act....................................................................................................passim

**COURT RULES**

Local Appellate Rule 28.3(d)..........................................................................28

Fed. R. App. 32 ................................................................................................29

Federal Rule of Civil Procedure 8 ................................................................2, 18, 20

## **INTRODUCTION**

Antitrust law exists to preserve price competition for the benefit of consumers. Yet Defendants,[1] in support of the erroneous ruling below, ask this Court to accept only a single national geographic market in which the ultimate consumer of the product—the inmates who use ICS—play no part. That cannot be right under the facts as alleged in the Complaint or the consumer-centric test established by this Court, which defines the geographic market by the area where the consumer looks to purchase the product.

Nor can the factual inaccuracies advanced by Defendants or the law as applied in *Host International, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242 (3d Cir. 2022), support the district court's dismissal for lack of antitrust injury. Smart—unlike the *Host* plaintiff—did not sue because it was offered unfavorable contract terms. Smart's claim is instead based on an exclusive contract with severe early termination penalties and unprecedented length designed to shut all competitors out of the market for years to come and subject inmates to monopoly prices—exactly what the antitrust laws were meant to remedy. Defendants sold the district court on a false narrative that Smart was merely a dissatisfied competitor who failed to "leverage" settlement negotiations into an ICS contract, but that most-favorable-to-Defendants' reading of the Complaint is plainly improper on review of a motion to dismiss.

---

[1] This brief follows the naming conventions used in Smart's opening brief.

The Complaint also adequately pleads tortious interference with prospective contractual relations and unfair competition based on GTL's defamatory statements made to York County officials.  Smart's detailed factual allegations satisfy Rule 8, and this Court should reject the incorrect, overly strict defamation pleading standard advanced by GTL.

The district court's dismissal of Counts I, II, and III of the Complaint should be reversed.

## REPLY ARGUMENT

## I.    THIS COURT HAS JURISDICTION.

GTL argues that Smart's initial Notice of Appeal (JA1) is "null" because the district court's order of dismissal with leave to amend (JA52–53) was not "appealable automatically upon expiration of the 21-day [amendment] period." (GTL Br. at 2–3).  GTL thus "disputes Smart's *Statement of Jurisdiction*" (*id.* at 2 (emphasis added)) but does not actually contest *this Court's* jurisdiction.  Smart, for the reasons stated in its opening brief (at 2–3), disagrees that its initial Notice of Appeal is "null."  Regardless, Smart does not need to score debaters' points here. Its Supplemental Notice of Appeal (JA5–6), filed after the district court entered a

final judgment in Defendants' favor (JA54), conferred jurisdiction on this Court and

GTL does not claim otherwise.[2]

## II. SMART'S COMPLAINT STATED A CLAIM UNDER SECTION 1 OF THE SHERMAN ACT.

The district court's finding that there is only a single, national market

involving contracts between prisons and ICS providers generally, and its further

conclusion that Smart lacked antitrust standing, were erroneous. The Complaint's

factual allegations and Third Circuit precedent dictate that (1) there must be another

relevant geographic market encompassing the Prison as the area where the end-

consumers buy the "product," and (2) GTL's renewed contract locking up that

market for as much as seven years harms competition in a manner sufficient to confer

antitrust standing. Defendants' arguments in support of the contrary rulings below

offer no basis for affirmance.

### A. The Prison is a relevant geographic market.

This Court's precedent is clear that "the geographic market is not comprised

of the region in which the seller attempts to sell its product, but rather is comprised

of the area where his customers would look to buy such a product." *Tunis Bros. Co.*

*v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991); *accord Hanover 3201 Realty,*

*LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 183 (3d Cir. 2015). The Prison is

---

[2] The York Defendants do not address this Court's jurisdiction and therefore appear to concede that the appeal was properly noted.

3

undeniably a relevant geographic market under this standard. YCP inmates are the "customers" as they are buyers of the "product" being sold (ICS), and the area where they look to buy that product is the Prison. The existence of another larger market in which ICS providers compete for contracts with correctional facilities "does not require acceptance of one segment as the relevant market and rejection of the other." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988). None of Defendants' arguments or cited authorities compel a different conclusion.

### i.     *Defendants' proposed single national market does not conform with the facts as alleged or the purpose of antitrust law.*

Defendants join the district court by insisting that there is only one national market in which the "buyer is the prison" and the ICS provider is the seller. (*E.g.*, GTL Br. at 22; York Br. at 14). But that belies both the facts and the law.

Under the facts alleged in the Complaint, and as Defendants well know, YCP, like other prisons, does not "buy" anything when it comes to ICS. Rather, they are *paid* commissions by ICS providers, who in exchange are allowed to sell ICS *to the inmates*. (*See* JA79 ¶ 42–43, 93–94 ¶ 99). As the D.C. Circuit has explained, "[i]n awarding contracts to [ICS] providers, correctional facilities usually give considerable weight to which provider offers the highest site commission, which is typically a portion of the provider's revenue or profits." *GTL v. FCC*, 866 F.3d 397, 404 (D.C. Cir. 2017). Those "revenue or profits" are earned from an ICS provider's operation of a "locational monopol[y] with a captive consumer base of inmates" who

4

have no choice but to use the ICS supplied by the prison to make calls. *Id.*; *see also Telecommunications Act of 1996*, 17 F.C.C. Rcd. 3248, 3253 (2002).

In short, the "consumers" are the inmates (JA100 ¶ 122), and the core commercial transaction is the sale of ICS to them by the ICS provider. Without that transaction, there is no market.

The Sherman Act's "central concern," since its enactment more than a century ago, has been "protecting *consumers* from monopoly prices." *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019) (citations and internal quotation marks omitted) (emphasis added). Under Defendants' theory of the case, however, the Sherman Act offers no protection for the consumers here because they are not even part of the market. Accordingly, Defendants' position cannot be squared with the purpose of the law any more than it can be squared with the facts as alleged.

> ii.     *Recognition of a national geographic market does not require rejection of the Prison as another relevant geographic market.*

While Defendants seek to cut out the segment of the market where the services are bought and sold, Smart does not disclaim the existence of a broader national market in which ICS providers compete for contracts with prisons. Smart's Complaint acknowledges that market, as Defendants repeatedly remind the Court. (*E.g.*, GTL Br. at 23; York Br. at 13). The existence of that market, however, does not preclude another relevant geographic market. As the Ninth Circuit said in *Oltz*, "[c]onsideration of the impact of the exclusive contract on competition does not

require acceptance of one segment as the relevant market and rejection of the other." 861 F.2d at 1447; *see also Tunis Bros. Co.*, 952 F.2d at 723 (recognizing possibility of "well-defined submarkets" within a broader market (citation omitted)).

GTL argues that *Oltz* does not apply here because the "district court explicitly found that the relevant market is nationwide" and "there was no finding of competing local or regional markets." (GTL Br. at 26). But that is exactly why the district court erred here: it recognized only one relevant market when in fact there are two.

Defendants protest that Smart failed to raise the dual market issue below while also repeatedly arguing that Smart's Complaint establishes the existence of national market.[3] But those contrary arguments cannot both be true. If the Complaint recognizes a national market—and Smart has already acknowledged that it does— then the Complaint also recognizes a dual or submarket because Smart's legal claim was plainly based on the anticompetitive effects in the local market for ICS within YCP, not the national market in which prisons contract with ICS providers. (*See, e.g.,* JA100 ¶ 122 ("The relevant geographic market is the YCP.")).

As to whether Smart previously "argued" the existence of a dual market, Smart's argument has been the same all along: The Prison is a relevant geographic market for purposes of its Sherman Act claim. Smart raised the dual market point

---

[3] The York Defendants did not challenge Smart's geographic market definition in the district court. (*See* Dist. Ct. Doc. 36).

in its brief to this Court only as means of explaining the error in the district court's finding that the relevant market "*must be* the nationwide ICS market." (JA20 (emphasis added)). Because the legal standard and facts on which Smart relies have not changed, it did not waive anything. *See Spireas v. Comm'r of Internal Revenue*, 886 F.3d 315, 321 (3d Cir. 2018) ("Our precedents reveal at least two characteristics that identical arguments always have. First, they depend on the same legal rule or standard. Second, the arguments depend on the same facts." (citation, brackets, and internal quotation marks omitted)).

      iii.       *Defendants cite no authority barring recognition of the Prison as a relevant geographic market under the unique circumstances of this case.*

While failing to persuasively distinguish *Oltz*, Defendants offer little in the way of their own authority. GTL relies on several cases as purportedly "defeat[ing]" Smart's proposed geographic market (Br. at 20, 22), but those cases do no such thing.

GTL's leading case is *Deborah Heart & Lung Center v. Virtua Health, Inc.*, 833 F.3d 399 (3d Cir. 2016), which it describes as having "reject[ed] the precise theory Smart asks the Court to adopt on appeal." (GTL Br. at 20). That description is specious. The geographic market in *Deborah*, as defined by the plaintiff hospital's own expert, consisted of a multi-county area, the exact size of which varied depending on whether the patient needed emergency or non-emergency services. *Id.* This market definition "*was not disputed*" in the district court and was not at issue

7

on appeal. *Id.* at 403 (emphasis added). The issue was instead whether Deborah (the plaintiff hospital) had presented sufficient evidence of anti-competitive effects from an exclusive contract between CGPA (a group of cardiologists) and Virtua Memorial (a rival hospital). *Id.* at 403. Deborah failed to do so because it focused on only a subset of the market, consisting of the CGPA's patients and patients entering the Virtua Memorial emergency room. *Id.* at 404. This evidence failed to conform with the market as defined by Deborah's own expert, and there was no evidence that "CGPA or Virtua Memorial were sufficiently unique to warrant reducing the size of the geographic market to only those entities." *Id.*

The issue here is *not* whether Smart presented sufficient evidence of anti-competitive effects in the geographic market as defined, but whether the Prison qualifies as a cognizable geographic market. *Deborah*'s only relevance on *that* issue is the recognition that a single facility may qualify as a relevant geographic market if "sufficiently unique." *Id.*; *cf. Host, supra*, 32 F.4th at 253 n.13 (declining to address "whether a single airport can constitute a geographic market"). The Prison so qualifies because, as already explained, it houses a "captive consumer base of inmates" subject to a "locational monopl[y]" over ICS. *GTL*, 866 F.3d at 404. Indeed, even the district court recognized the "unique circumstances present in the prison context," owing to the inmates' inability to "look anywhere outside the walls

of YCP for ICS." (JA18, 19). Thus, rather than "foreclos[ing] Smart's argument" (GTL Br. at 21), *Deborah* opens the door to it.

GTL also charges Smart with "[i]gnoring" two other cases that purportedly "defeat[] Smart's relevant geographic market theory": *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963), and *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011)), *rev'd*, 569 U.S. 27 (2013). (GTL Br. at 22). As with *Deborah*, Smart had no reason to address these cases until now because they are inapt and do not "defeat" its geographic market theory.

*Philadelphia National Bank* concerned the lawfulness of a bank merger under Section 7 of the Clayton Act. 374 U.S. at 323–24. The Supreme Court in that context quoted from a Clayton Act Section 3 case, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), that "the 'area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.'" *Philadelphia Nat. Bank*, 374 U.S. at 359 (*quoting Tampa Elec. Co.*, 365 U.S. at 327). This standard, according to GTL, "mandates a nationwide geographic market because both Smart and GTL 'operate' nationwide." (GTL Br. at 22 (brackets omitted)). GTL is wrong.

As the Supreme Court further explained in *Tampa Electric*: "'It is clear, of course, that the "line of commerce" affected *need not be nationwide*, at least where

the purchasers cannot, as a practical matter, *turn to suppliers outside their own area*.'" 365 U.S. at 327 (quoting *Standard Oil Co. v. United States*, 337 U.S. 293, 299 n.5 (1949)) (emphasis added)). Thus, while the geographic market under the *Tampa Electric* standard must naturally include the area where the seller operates, its boundaries are, in fact, determined by the *purchaser*.[4]

This Court's precedent confirms as much. In *Tunis Brothers*, a Sherman Act Section 1 case, this Court cited *Tampa Electric* as supporting its definition of the relevant geographic market as "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros.*, 952 F.2d at 726 (citations and internal quotation marks omitted). The Court applied this rule in *Hanover 3201 Realty* to hold that the greater Morristown, New Jersey area was a plausible geographic market for the exclusion of supermarket chain Wegman's because "when it comes to buying groceries, consumers like to shop near their homes." 806 F.3d at 184.

The consumers here—the inmates—cannot "look anywhere outside the walls of YCP for ICS." (JA18). YCP thus qualifies as a relevant geographic market under the *Tampa Electric* standard as applied in the Third Circuit.

---

[4] For this reason, the York Defendants also misstep in their argument that "the market is the commodity." (York Br. at 19). The market is the *area* in which the buyer *shops* for the commodity.

Likewise, Smart's geographic market definition conforms with "the commercial realities of the industry being considered." *Behrend*, 655 F.3d at 194 (citation and internal quotations omitted). *Behrend* does not suggest otherwise. The holding in the cited portion of *Behrend* was that the district court did not abuse its discretion in determining, based on a full factual record, that a putative class of cable television customers might "be able to prove through common evidence that the relevant geographic market [was] the Philadelphia DMA" (an area in and around Philadelphia). *Id.* at 194–95. This decision was "made solely for the purposes of class certification" and was not "binding on the merits," meaning that cable provider remained free to argue that the relevant geographic market was the individual household. *See id.*

*Behrend* therefore did not "reject[]" a geographic market consisting of individual households, as GTL contends (GTL Br. at 22); it merely held that the district court was not required, at the class certification stage, to accept that market definition. If individual households can be a relevant geographic market in the cable television industry—and *Behrend* leaves open that possibility—then there is no reason why a prison with hundreds or thousands of inmates cannot be a relevant geographic market in the ICS industry given its unique "commercial realities."

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505 (8th Cir. 2018), another case featured by GTL (Br. at 23), is even farther afield. The Eighth

Circuit rejected the relevant *product* market proposed by the plaintiff, consisting of "the market for mail-order pharmacy services to Express Scripts members—a submarket made up of only Express Scripts's services within the broader market of all mail-order pharmacy services." *Park Irmat*, 911 F.3d at 517. Unlike the Prison here, that market was too narrow because Express Scripts was "not the only mail-order pharmacy available to consumers" even though some customers may have been contractually bound to use Express Scripts. *Id.*

Here, no one disputes that ICS is a relevant product market; the issue is the geographic market. Smart has not defined that market by any "contractual restrictions" imposed by the Prison (GTL Br. at 23), but instead by—to borrow a phrase quoted by GTL—"the commercial realities of the industry being considered." (*Id.* at 22). Those commercial realities dictate that the inmates can look no further than their prison for ICS, and that limitation is therefore market defining.

The York Defendants, for their part, offer nothing new. They merely attempt—unsuccessfully—to distinguish *some* of the cases cited by Smart and prop up the few cases cited by the district court. While Smart will largely rely on what it said about those cases in its opening brief, the York Defendants' treatment of *Daleure v. Commonwealth of Kentucky*, 119 F. Supp. 2d 683 (W.D. Ky. 2000), bears mentioning. They *do not dispute* its legal conclusion that a jail could be a relevant geographic market. (*See* York Br. at 16). Their only basis for distinguishing that

12

case is that the lawsuit was brought by the recipients of collect calls from inmates. (*Id.*). But that is a distinction without a legal difference.[5]

The geographic market is not defined by who brings the lawsuit. Again, it is determined by "the area in which a potential buyer may rationally look for the goods or services he or she seeks." *Tunis Bros.*, 952 F.2d at 726. And as discussed more fully below, Smart is a proper party to redress harm to the inmate-buyers from anticompetitive conduct. The statute creating a private right of action under the antitrust laws "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers[.] The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 472 (1982) (citation and internal quotation marks omitted) (referring to Section 4 of the Clayton Act, 15 U.S.C. § 15).

*Daleure*'s recognition that a prison can be a relevant geographic market thus applies equally here. The district court erred by concluding otherwise.

---

[5] GTL's grounds for distinguishing *Daleure* are equally unpersuasive. It contends that the *Daleure* complaint survived dismissal only because the court applied the outmoded "no set of facts" pleading standard. (GTL Br. at 24). But as GTL elsewhere argues, the market question at this stage is one of legal cognizability, not sufficiency of facts. (*Id.* at 21 n.7). GTL also argues that *Daleure* is "contravene[d]" by *Deborah*, *supra*, 833 F.3d 399, but as discussed above, the geographic market was not at issue in *Deborah*.

13

**B.    Smart has antitrust standing.**

 "As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement" includes "consumers and competitors in the restrained market." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010).  By this basic measure, the district court erred by concluding that Smart, a competitor, lacked antitrust standing.

Defendants swayed the district court to reach a different conclusion with a supplemental citation to *Host*, *supra*, 32 F.4th 242, and a false narrative casting Smart as a disgruntled competitor who tried and failed to "leverage" a patent lawsuit into an ICS contract.  (*See* JA25, 27).  It is hardly surprising, then, that Defendants replay here the strategy that succeeded below.  But Smart's Complaint suffers from neither of the defects identified in *Host*, and black-letter law requires that its factual allegations be viewed in the light most favorable to Smart—*not* Defendants.  *See, e.g.*, *Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022).  The district court's reliance on *Host* and Defendants' recasting of the facts was erroneous.

*i.    Smart, unlike Host, pleaded an unreasonable restraint on trade.*

As Smart explained in its opening brief (at 34), there were two reasons for a lack of antitrust standing in *Host*, neither of which applies here.  The first reason was that *Host* "did not like the terms [of Marketplace's proposed lease] and, weighing its options, declined the offer."  *Id.* at 250.  Host's antitrust claim was therefore based

on "[a]n objectionable term in a commercial agreement," not an "unreasonable agreement in restraint of trade," as required for a Sherman Act violation.  *Id.*

Defendants contend that this case is no different because Smart is simply upset about losing out on an exclusive contract.  (GTL Br. at 30–31; York Br. at 24, 26).  Willingly walking away from contract negotiations, as in *Host*, instead of being shut out of the market by a lengthy "tie up" contract awarded to a competitor, as here, is hardly an "irrelevant" distinction.  (GTL Br. at 32; *see also* York Br. at 24 (calling the difference "not determinative")).  In the walk-away situation, "competition has not been suppressed," *Host*, 32 F.4th at 250, but the opposite is true in the shut-out situation.

But even if *Host* applies equally to "los[ing] the contract to a competitor" (York Br. at 24), the asserted antitrust injury here is *not* losing out on the contract; rather, it is the unprecedented, competition-harming nature of the exclusive contract awarded to GTL.  As the Complaint explains:

> 117.  All of the contracts between GTL and York County prior to [the most recent renewal] were for 2 years with no penalty or liquidated damages for earlier termination.  None of those prior contracts provided for indemnification of unrelated lawsuits.  The extended length of Amendment 10 [5 years with two automatic one-year renewals], the termination penalty, and the indemnification provision were specifically added to the agreement when Smart Communications challenged GTL's exclusive provision of ICS to York County.  These provisions deviated from at least 16 years of GTL's prior contractual relationship and were designed to preclude market entry competition in the York County Prison market by Smart Communications specifically and others generally.

15

(JA 98). An exclusive contract with the length and features found here supports a finding of anti-competitiveness under this Court's precedent. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287 (3d Cir. 2012) (holding that minimum five-year contracts of "unprecedented length" that were difficult to "walk away from" supported finding of anti-competitiveness). The Complaint therefore alleges unreasonable agreement in restraint of trade, not just objectionable contract terms or a refusal to award a contract.

### ii.    *Smart, unlike Host, pleaded harm to consumers.*

The other reason for a lack of antitrust standing in *Host* was that Host "fail[ed] to plead facts tending to show that consumer prices would increase under the [objectionable contract term]." 32 F.4th at 251. As result, Host could not "prove that the challenged conduct affected the prices, quantity or quality of goods or services, not just its own welfare." *Id.* (citation, brackets, and internal quotation marks omitted). Here, by contrast, Smart specifically alleged the very thing that was found lacking in *Host*:

> 42. . . . Smart Communications' proposal would have more than doubled York County's annual ICS commission received from GTL— from approximately $900,000 per year, to a baseline guaranteed $2 million per year based on the same number of inmates, while providing more services for inmates at no cost to YCP.

> 43. In addition, Smart Communications' proposal *would have reduced by approximately fifty percent the rates paid by inmates and their families, friends, and attorneys for inmate telephone calls*.

(JA79 (emphasis added)).

16

Smart also alleged that the loss of revenue to York County and the higher rates for inmates harmed competition, not just its own welfare:

> 127. York County's exclusive dealing arrangement with GTL has significant anticompetitive effects that are not counterbalanced by any procompetitive benefits. Inmates and call recipients are forced to pay rates for ICS that far exceed the rates that they would pay in a competitive market. This is reflected in the savings that inmates and their family, friends, and attorneys would have received under Smart Communications' proposal for ICS at the YCP.

> 128. York County citizens are also harmed by the anticompetitive acts of the Defendants. But for the unlawful acts described herein, York County would have received an additional $1 million per year in commissions under Smart Communications' proposal, money that would have benefited York County citizens and taxpayers.

(JA102).

The district court itself recognized the "important" distinction between this case and *Host* based on Smart's allegation that "the price per call for YCP inmates under the YCP-GTL contract is higher than it would have been if YCP contracted with Smart." (JA25). GTL does not address this "important" allegation or the corresponding finding by the district court, and the York Defendants argue only that allegation of a price increase is "conclusory" because it is not backed by "data," "studies," or "comparisons." (York Br. at 25). In fact, the Complaint specifies the exact percentage by which the rates would have gone down under Smart's proposal. And regardless, the asserted need for "data," "studies," or "comparisons" is

inconsistent with Rule 8, which "does not require 'detailed factual allegations.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

The district court, moreover, did not find a lack of antitrust injury because the alleged price reduction was "conclusory." Instead, the district court adopted Defendants' narrative that Smart was "seeking to remedy [its] alleged harm from [its] loss of [its] attempt to leverage the ICS contract with YCP." (JA27). While Defendants unsurprisingly find no problem with this characterization, the Complaint does not support it. Under the facts as alleged, Smart only learned that the ICS contract was set to expire after settlement discussions were already underway, and nine months *after* it had initiated the patent infringement action. (*See* JA77–78). The Complaint also says nothing about Smart tying settlement of the patent litigation to an award of the ICS contract. Smart simply pursued a business opportunity that unexpectedly arose during settlement negotiations—and that is the inference that should have been drawn from the Complaint properly read in the light most favorable to Smart as the non-moving party.

The district court's adoption of a different inference advanced by Defendants was improper and should not support the dismissal of Smart's Sherman Act claim.

## III. THE COMPLAINT STATED CLAIMS FOR TORTIOUS INTERFERENCE AND UNFAIR COMPETITION

In arguing that Smart failed to adequately plead defamation as the basis for its state law claims, GTL doubles down on the district court's finding that Smart's

allegations of false statements were too "conclusory," while also hedging its bet with two alternative grounds for affirmance. But the case law leaves GTL empty handed. Because Smart adequately alleged defamation as the basis for tortious interference with prospective contractual relations, that claim should not have been dismissed. And because GTL is wrong that defaming a rival is not unfair competition under Pennsylvania law, that claim should not have been dismissed, either.

### A.    The Complaint adequately pleads defamation even under GTL's overly strict, incorrect standard.

There is no dispute that defamation qualifies as "wrongful" or "improper" conduct sufficient to meet the "absence of privilege or justification" element for tortious interference with prospective contractual relations.[6] (*See* GTL Br. at 35–42). According to GTL though, to successfully plead defamation, a plaintiff "must allege at least some specific statements identifying the speaker, the approximate date, the content, and the audience.'" (GTL Br. at 41 (quoting *Lee v. Univ. of Pa., Sch. of Dental Med.*, No. CV 19-835, 2019 WL 4060843, at *6 (E.D. Pa. Aug. 27, 2019)). Yet that is not the correct standard.

---

[6]    The district court found that "GTL's conduct was justified" because it "had a legitimate business concern and acted to protect that legitimate business concern." (JA45). To the extent the district court believed that GTL's prior business relationship allowed it to defame Smart, no case cited by GTL or the district court grants business competitors immunity for otherwise tortious conduct when the competitor acts to protect an existing business relationship.

GTL accurately quotes *Lee*, but *Lee* cites no authority for the heightened standard on which GTL relies. Moreover, the preceding paragraph in *Lee* sets out a less exacting standard supported by authority:

> The pleading standard governing Plaintiff's defamation claim in this Court is set out in Federal Rule of Civil Procedure 8(a). Under this rule, "*a defamation plaintiff does not have to plead the precise defamatory statements, nor must she specifically name the person who made the statements.*" *Tuman v. Genesis Assocs.*, 935 F. Supp. 1375, 1391 (E.D. Pa. 1996) (Padova, J.) (quoting *Lynch v. Borough of Ambler*, No. 94-6401, 1995 WL 113290, at *5-6 (E.D. Pa. Mar. 15, 1995) (Kelly, J.)).

*Id.* (emphasis added)

This is the correct standard, not the unsupported standard quoted by GTL. As a recent district court decision explains, the requirement that a defamation claim "specifically identify what allegedly defamatory statements were made by whom and to whom . . . only governs defamation claim[s] brought in Pennsylvania courts." *P&I Ins. Servs., LLC v. Risk Averse Ins.*, LLC, No. CV 20-5910, 2022 WL 103135, at *10 n.4 (E.D. Pa. Jan. 11, 2022) (citation and internal quotation marks omitted) The pleading standard governing defamation claims in federal court, "by contrast, is set out in Federal Rule of Civil Procedure 8(a), which does not require the same degree of specificity." *Id.* (citation omitted); *see also Roskos v. Sugarloaf Twp.*, 295 F. Supp. 2d 480, 492 (M.D. Pa. 2003) ("[F]or a defamation claim brought in federal court, the plaintiff does not have to plead the precise defamatory statements as long as the count provides sufficient notice to the defendant.").

20

But even if the heightened standard applied, Smart's Complaint meets it. As Smart identified in its opening brief (at 40), the Complaint includes a detailed recounting of who made the false, defamatory statements, where and when they were made, and to whom they were made. (*See* JA84–85 ¶¶ 67–70, 87 ¶ 77, 92 ¶ 95)). No more detail was required. The district court's contrary conclusion was erroneous.[7]

### B. GTL's alternative grounds for affirmance fail—the false statements are actionable and are reasonably likely to have caused Smart to lose the contract.

GTL offers two alternative grounds for affirming the dismissal of Smart's tortious interference claim: that the alleged defamatory statements were "opinions" or "predictions" and that the "Complaint alleged no facts showing that the allegedly defamatory statements caused York County not to contract with Smart." (GTL Br. at 38–40). These alternative arguments cannot save the district court from reversible error.

---

[7] GTL asserts that Smart "purported to establish the elements of a defamation claim" for the first time in its opposition to GTL's motion to dismiss, and that Smart could not have "cured its pleading defect through this opposition." (GTL Br. at 37 n.13). This is simply untrue. Smart's Complaint clearly premised its tortious interference claim on what the Complaint summarizes as GTL's "knowingly false and defaming statements" about Smart's "viability as a company," "patents," and "services in relation to GTL's patents." (JA84–85 ¶ 67; *see* JA109–110 ¶ 159 (listing false representations in support of tortious interference claim)). At no point in its opposition below did Smart rely on facts outside its Complaint to "cure" any pleading deficiency, and it has not done so here, either.

> i. *The false statements are actionable statements of fact or opinion implying defamatory facts.*

Statements are defamatory when they "tend to lower a person in the estimation of the community, deter third persons from associating with him, or adversely affect his fitness for the proper conduct of his lawful business or profession." *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 477 (E.D. Pa. 2010). "Only statements of fact, not expressions of opinion, can support an action for defamation," but "an opinion that could reasonably be understood to imply undisclosed defamatory facts" is actionable. *Pace v. Baker-White*, 432 F. Supp. 3d 495, 512 (E.D. Pa. 2020), *aff'd*, 850 F. App'x 827 (3d Cir. 2021).

Smart alleged that GTL defamed it by telling York Count officials: (1) that "if YCP proceeded to replace GTL's phone equipment with Smart Communications' phone equipment, GTL had a right to and would exercise its right to seize Smart Communications' equipment based on an alleged judgment that GTL had received against Lattice," a company from which Smart purchased certain licensing rights, and (2) that "Smart Communications was infringing multiple GTL patents, and that GTL would sue Smart Communications and immediately obtain an injunction to prohibit Smart Communications from providing certain services that were the subject of Smart Communications' proposal to York County and YCP." (JA85). Both are actionable statements.

Pennsylvania law "distinguishes a statement of fact from a statement of opinion by whether it can be 'objectively determined.'" *Meyers v. Certified Guar. Co., LLC*, 221 A.3d 662, 670 (Pa. Super. Ct. 2019) (citation omitted). "A statement of fact can be verified as true or false, whereas an expression of opinion only conveys a subjective belief of the speaker." *Id.*; *accord Monge v. Univ. of Pa.*, No. CV 22-2942, 2023 WL 2391004, at *3 (E.D. Pa. Mar. 7, 2023).

The first statement easily qualifies as a statement of fact under this standard because whether GTL had a judgment giving it the right to seize Smart's equipment can be objectively verified as true or false. If proved to be false, this statement is plainly defamatory as it charges Smart with "characteristics and conduct which are incompatible with the proper exercise of a business." *Forrest v. Owen J. Roberts Sch. Dist.*, No. CIV.A.09-3014, 2011 WL 1549492, at *17 (E.D. Pa. Apr. 1, 2011) (citation, alteration, and internal quotation marks omitted); *see also Sarkisian v. Rooke*, No. 06-CV-00170, 2007 WL 9811040, at *4 (E.D. Pa. Mar. 23, 2007) (citing cases "in which direct or implied insults to a business have been held to be defamatory").

As to the second statement, district courts applying Pennsylvania law have repeatedly recognized that allegations of patent infringement by a competitor like those alleged here qualify as actionable statements of fact or opinion that imply

defamatory facts.[8] *See Synthes (U.S.A.) v. Globus Med., Inc.*, No. CIV.A. 04-CV-1235, 2005 WL 2233441, at *4 (E.D. Pa. Sept. 14, 2005); *Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. CIV.A. 99-1568, 1999 WL 1212189, at *2 & n.1 (E.D. Pa. Dec. 17, 1999); *PennPac Int'l, Inc. v. Rotonics Mfg., Inc.*, No. CIV. A. 99-CV-2890, 2001 WL 569264, at *10 (E.D. Pa. May 25, 2001).   These cases are dispositive.

> ii.      *There is a reasonable likelihood the false statements caused Smart to lose the contract.*

GTL's other proposed alternative ground for affirmance fares no better. Allegations that the defendant spread false information about the plaintiff to a prospective contractual partner are sufficient, at the pleading stage, to establish "a reasonable likelihood that the relationship would have occurred but for the interference of the defendant." *See Barron v. Washington Cnty. Child. & Youth Soc. Serv. Agency*, No. CIV.A. 05-1517, 2006 WL 931678, at *6 (W.D. Pa. Apr. 11, 2006).

In *Barron*, the plaintiff alleged that foster agencies in her home county tortiously interfered with her ability to contract with agencies in neighboring counties by leaking false information about her fitness as a parent. *Id.* The district

---

[8] As explained in Smart's opening brief (at 41 n.10), to the extent these statements were directed at Smart's goods or products, they qualify as commercial disparagement. *See, e.g., Electro Med. Equip. Ltd. v. Hamilton Med. AG*, No. CIV.A. 99-579, 2000 WL 675716, at *2 (E.D. Pa. May 24, 2000).

court held that the complaint sufficiently alleged "an objectively reasonable probability" that the plaintiff would have contracted with the other agencies absent the alleged falsehoods because she was previously approved to provide foster services in her home county. *Id.*; *see also Synthes*, 2005 WL 2233441, at *7 (allegations that competitor made defamatory statements to plaintiff's "potential employees, users, and purchasers" sufficient to state a claim for tortious interference with prospective contractual relations).

Here, the inference that a contractual relationship would have occurred but for the false statements is even stronger than in *Barron*. The Complaint alleges that at the time of the statements, Smart was not just contemplating a contract with York County, but was in the midst of productive contract negotiations to become the new ICS provider, with all feedback from Prison officials being positive and reinforcing. (JA82–86). Following the meeting with GTL in which the defamatory statements were made, those negotiations fizzled out (through no fault of Smart) and GTL's contract was renewed. (JA86–88). These allegations are more than sufficient to satisfy the fifth element of the tort.

### C. Pennsylvania recognizes unfair competition based on defaming a business rival.

GTL contends that Smart's unfair competition claim was properly dismissed because *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 203 A.2d 469 (Pa. 1964), and Pennsylvania law more generally, do not recognize unfair competition based on

defamatory statements intended to harm a business competitor. (GTL Br. at 44–45). GTL is incorrect. *Schneider Dairy* states, in plain terms, that the "making of false and misleading representations by former employees so as to play on sympathies of customers and influence them so they can be obtained by new employer is unfair competition." *Id.* at 473. As one Pennsylvania court has recognized, "this holding represents an extension of unfair competition beyond trade secrets and product misidentification" to include defamatory statements made to disrupt a competitor's business. *Lakeview Ambulance & Med. Servs., Inc. v. Gold Cross Ambulance & Med. Servs., Inc.*, No. 1994-2166, 1995 WL 842000, at *3 (Pa. Com. Pl. Oct. 18, 1995); *see also Synthes*, 2005 WL 2233441, at *9 ("[I]n stating a claim for defamation, trade libel and tortious interference with contract, Globus has pleaded sufficient facts to support a cause of action for unfair competition.").

Whether Smart's unfair competition claim was "duplicative" of its tortious interference claim (GTL Br. at 43) is of no moment. A party is allowed to assert multiple claims based on the same facts—indeed, it must do so to avoid *res judicata*. *See, e.g., Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 172 (3d Cir. 2009).

Smart's state law claims were sufficiently pled and the district court erred in dismissing them.

## CONCLUSION

For the foregoing reasons and those stated in Smart's opening brief, this Court should reverse the district court's dismissal of Counts I, II, and III of the Complaint and remand for further proceedings.

Dated: May 24, 2023                      Respectfully submitted,

                                         /s/ *Matthew M. Haar*

William N. Sinclair                      Matthew M. Haar
Phillip J. Closius                       SAUL EWING LLP
Todd W. Hesel                            2 N. Second Street, 7th Floor
SILVERMAN THOMPSON SLUTKIN &             Harrisburg, PA 17101
    WHITE LLC                            matt.haar@saul.com
400 E. Pratt St., 9th Floor              (717) 257-7508
Baltimore, Maryland 21202
(410) 385-2225                           Katrina M. Quicker
                                         Kathryn A. Vance
                                         QUICKER LAW, LLC
                                         800 Battery Avenue SE, Suite 100
                                         Atlanta, GA 30339
                                         (678) 750-0450

                                         *Attorneys for Appellants*

## <u>CERTIFICATION OF BAR MEMBERSHIP</u>

Pursuant to Third Circuit Local Appellate Rule 28.3(d), I hereby certify that I

am admitted to the bar of this Court.

/s/ *Matthew M. Haar*

Matthew M. Haar, Bar No. 85688

## <u>CERTIFICATE OF COMPLIANCE</u>

I HEREBY CERTIFY that the foregoing Reply Brief of Appellants:

1.     Complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,455 words.

2.     Complies with the typeface requirements of Fed R. App. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365, in Times New Roman 14-point font.

3.     Has been scanned with the virus detection program Windows Security and no virus was detected.

4.     The hard copies are identical to the electronic versions.

*/s/ Matthew M. Haar*
Matthew M. Haar
*Attorney for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on this 24th day of May 2023, I caused the Reply

Brief of Appellants to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to all counsel of record.

/s/ *Matthew M. Haar*

Matthew M. Haar
*Attorney for Appellants*